In re BELL & BECKWITH, Debtor.

Patrick A. McGRAW, Trustee,
Plaintiff–Appellee,

v.

SOCIETY BANK & TRUST,
Garnishee–Appellant.

No. 92–3676.

United States Court of Appeals,
Sixth Circuit.

Argued June 29, 1993.

Decided Sept. 16, 1993.

Glenn L. Rambo, Mary Ann Whipple (argued and briefed), Fuller & Henry, Toledo, OH, for plaintiff-appellee.

Bruce S. Schoenberger (argued and briefed), David P. Strup (briefed), Gressley, Kaplin & Parker, Toledo, OH, for garnishee-appellant.

Before: MILBURN and NORRIS, Circuit Judges; and WISEMAN, District Judge.*

ALAN E. NORRIS, Circuit Judge.

Society Bank & Trust ("Society"), the garnishee-defendant below, appeals the district court's ruling allowing plaintiff, bankruptcy trustee Patrick A. McGraw, the opportunity to prove that Bell & Beckwith's ("B & B") contributions to its profit-sharing retirement plan were invalid. If proved invalid, the district court concluded that the contributions could be garnished for the benefit of B & B's bankruptcy estate, despite the anti-alienation provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Because we conclude that any contributions made in violation of the terms of the profit-sharing retirement plan were void *ab initio* and, consequently, are properly part of the bankruptcy estate, we affirm.

## FACTS

B & B was a limited partnership that conducted a stock brokerage business in Toledo, Ohio. It entered bankruptcy in 1983 after it was discovered that its managing and general partner, Edward P. Wolfram, Jr., had embezzled approximately $47 million.

B & B set up the Bell and Beckwith Profit Sharing Retirement Plan and Trust ("the plan") in 1974. Society served as trustee of the plan, which was approved by the Internal Revenue Service as an ERISA qualified pension plan for treatment under the Internal Revenue Code. It contained two provisions important to this appeal. The first, required by ERISA, is an anti-alienation clause:

12.3 The benefits provided hereunder shall not be subject to alienation, assignment, garnishment, attachment, execution or levy of any kind, and any attempt to cause such benefits to be so subjected shall not be recognized, except to such extent as may be required by law.

The plan, Article XII, cl. 12.3.

The second provision details the profit-sharing calculation to be made by the employer to set its yearly contributions to the plan.

3.1 ... Contributions shall be made by the Employer only out of the Employer's net income from its business, provided that if such net income of the Employer is less than the total Employer contributions provided for herein for any Plan Year, contributions on behalf of each Participant for any such year shall be reduced ratably. Net income shall be determined in accordance with generally accepted accounting practices and shall be computed before any provisions for contributions under the Plan for any such year.

The plan, Article III, cl. 3.1. Under this provision, then, contributions to the plan would be proper only if B & B had net income from which to make the contributions.

B & B made contributions to the plan on behalf of its general partners, including Wolfram, until Wolfram's fraud was disclosed. B & B's trustee in bankruptcy, McGraw, believes that he can show that the partnership had no net income for a number of years prior to 1983. It follows, he contends, that

---

* The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

contributions were made in violation of the terms of the plan and were void *ab initio.*

During the adversarial bankruptcy proceedings below, McGraw initiated suit against the general partners of B & B. He obtained a deficiency judgment against Wolfram and several other general partners and obtained writs of execution against their individual interests in the plan.[1] Society, as trustee of the plan, objects to the writs on the ground that the anti-alienation provision of ERISA exempts the pension plan from garnishment.

In the proceedings below, the bankruptcy court concluded that ERISA shielded the partners' assets in the plan, and ruled for Society. McGraw appealed and the district court reversed, holding that the bankruptcy trustee should have an opportunity to prove either that the contributions were invalid as preferences or fraudulent conveyances, or that they were invalid because they were not supported by net income. This appeal followed.

## DISCUSSION

 The Supreme Court appears to have drawn a bright line rule concerning the alienability of pension benefits: they may not be alienated either voluntarily or involuntarily, inside or outside of bankruptcy, or for equitable reasons. The rule is based upon the anti-alienation provision found in ERISA, which mandates that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1).

The Court confronted the issue of alienability in *Guidry v. Sheet Metal Workers Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990). *Guidry* dealt with a situation in which a union leader, who was also a trustee for one of the union's three pension plans, had embezzled funds from the union. While incarcerated, Guidry filed suit against the pension plans when they determined that he had forfeited any right to his pension benefits as the result of his criminal activities. The district court imposed upon those benefits a constructive trust for the benefit of the union to satisfy a judgment the union had obtained against Guidry. Although the court of appeals affirmed, the Supreme Court concluded that the constructive trust violated ERISA's prohibition on assignment or alienation of pension benefits. *Guidry,* 493 U.S. at 373–75, 110 S.Ct. at 685–87. The Court was unwilling to approve a generalized equitable exception to the prohibition. *Id.* at 376, 110 S.Ct. at 687.

In *Guidry,* the Court discussed the purposes of ERISA and the anti-alienation clause:

> Section [1056(d)(1)] reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them....
>
> ... [C]ourts should be loath to announce equitable exceptions to legislative ... prohibitions that are unqualified by the statutory text. The creation of such exceptions ... would be especially problematic in the context of an antigarnishment provision. Such a provision acts, by definition, to hinder the collection of a lawful debt. A restriction on garnishment therefore can be defended *only* on the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties. It makes little sense to adopt such a policy and then to refuse enforcement whenever enforcement appears inequitable. A court attempting to carve out an exception that would not swallow the rule would be forced to determine whether application of the rule in particular circumstances would be "especially" inequitable.

*Id.*

The Supreme Court adhered to this reasoning when it determined in *Patterson v. Shumate,* —— U.S. ——, ——–——, 112 S.Ct. 2242, 2246–48, 119 L.Ed.2d 519 (1992), that ERISA's anti-alienation protection ap-

---

**1.** McGraw currently seeks to attach only Wolfram's interest in the plan, since he has settled his claims against the other general partners.

plies in the context of bankruptcy as well, so that a bankrupt's pension benefits were excluded from his bankruptcy estate.[2] In reiterating its refusal to engraft equitable exceptions upon ERISA's anti-alienation clause, a unanimous Court discussed the policy concerns underlying ERISA, as well as those underlying the bankruptcy code. First, the Court noted that the treatment of pension benefits, both inside and outside of bankruptcy, should be uniform. *Id.* at ——, 112 S.Ct. at 2249 (citing *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1978)). Second, it stressed the goal of protecting pension benefits. *Id.* —— U.S. at ——, 112 S.Ct. at 2250. And finally, it stressed the desirability of "uniform national treatment of pension benefits." *Id.* This court, prior to *Patterson,* had stressed similar policy concerns and emphasized the need to exempt pension plans from conflicting state and local regulations. *In re Lucas,* 924 F.2d 597, 603 (6th Cir.1991) (holding that pension benefits are not property of the estate under the bankruptcy code), *cert. denied,* —— U.S. ——, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991).

In neither *Guidry* nor *Patterson* was the propriety of pension contributions at issue. Here, according to McGraw, the district court, rather than carving out an equitable exception to ERISA, simply said that any contributions made on behalf of Wolfram in violation of the net income requirement of the plan would be void *ab initio.* Since void, they never became a part of the plan, and so were not being alienated within the contemplation of the ERISA prohibition. McGraw therefore contends that the policy concerns of *Guidry* and *Patterson* are not implicated in the present case. We agree.

What is unique about the plan in this case is that it is a profit-sharing plan, where the terms of the plan comport with shared liability concepts of partnership law by providing that money would be available for making contributions to the plan on behalf of the partners only when the partnership could lay claim to net income. Because the plan expressly limited contributions to being made out of B & B's net income, contributions fraudulently made on behalf of partners, or induced by a partner's fraud, when there was no net income would be void *ab initio.* Since the partners had no right to expect contributions to the pension plan would be made on their behalf when the partnership had no profits, they are in no position to complain should those contributions be returned to the partnership's estate. Unlike the situations in *Patterson* and *Guidry,* there are no public policy considerations arguing that the contributions deserve to be shielded by ERISA from the reach of the creditors of B & B's estate.

In affirming the district court's decision that trustee McGraw should have the opportunity to prove that contributions to the plan on behalf of the general partners were invalid because they were made when B & B had no actual net income to support such contributions, we take no position on what constitutes net income. It is not clear to us, for example, what bearing, if any, Wolfram's embezzlement would have on a determination of net income. In addition, since the reasoning given above is adequate to support the district court's order, we do not reach the question of whether the contributions amounted to preferential or fraudulent transfers. As a practical matter, that question is subsumed within the parameters of the net income issue.

Accordingly, the order of the district court, dated June 3, 1992, is **affirmed.**

---

**2.** The Bankruptcy Code broadly defines property of the estate. *See* 11 U.S.C. § 541. Nevertheless, a statutory exclusion applies to pension benefits. Section 541(c) provides: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2). *Patterson* clarified that "applicable nonbankruptcy law" is meant to include pension benefits as well as trusts settled under state law. *Patterson,* —— U.S. at ——, 112 S.Ct. at 2247–48.